UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| LORRAINE SAINT PIERRE,              )<br>                                                           )<br>            Plaintiff,                           )<br>                                                           )<br>v.                                                       )   Docket no. 2:21-cv-00300-GZS<br>                                                           )<br>NFG HOUSING PARTNERS LP &   )<br>PRESERVATION MANAGEMENT,   )<br>INC.,                                                 )<br>                                                           )<br>            Defendants.                      )  | |

**ORDER GRANTING SUMMARY JUDGMENT**

Before the Court is Defendants' Motion for Summary Judgment (ECF No. 64) as well as Defendants' Motion to Strike Plaintiff's "Stipulated Record" and "Statement of Facts" (ECF No. 60). For reasons explained herein, the Court GRANTS both Motions.

**I.     LEGAL STANDARD FOR SUMMARY JUDGMENT**

A party is entitled to summary judgment if it appears, based on the record before the Court, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is 'genuine' if the evidence is such that a reasonable jury could resolve the point in the favor of the non-moving party, and a fact is 'material' if it has the potential of affecting the outcome of the case." Taite v. Bridgewater State Univ., Bd. of Trs., 999 F.3d 86, 93 (1st Cir. 2021) (cleaned up). The party moving for summary judgment must demonstrate an absence of evidence that supports the nonmoving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).

Once the moving party has made this preliminary showing, the nonmoving party must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy

issue." Triangle Trading Co. v. Robroy Indus., Inc., 200 F.3d 1, 2 (1st Cir. 1999) (cleaned up); see Fed. R. Civ. P. 56(e). "That evidence, however, cannot 'rely on improbable inferences, conclusory allegations, or rank speculation.'" Snell v. Neville, 998 F.3d 474, 486 (1st Cir. 2021) (alterations in original omitted) (quoting Enica v. Principi, 544 F.3d 328, 336 (1st Cir. 2008)). "As to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment for the moving party." In re Ralar Distribs., Inc., 4 F.3d 62, 67 (1st Cir. 1993). "However, summary judgment is improper when the record is sufficiently open-ended to permit a rational factfinder to resolve a material factual dispute in favor of either side." Morales-Melecio v. United States (Dep't of Health and Hum. Servs.), 890 F.3d 361, 368 (1st Cir. 2018) (cleaned up). "When determining if a genuine dispute of material fact exists, [courts] look to all of the record materials on file, including the pleadings, depositions, and affidavits without evaluating the credibility of witnesses or weighing the evidence." Taite, 999 F.3d at 93 (cleaned up).

District of Maine Local Rule 56 prescribes a detailed process by which the parties are to present to the Court the "material facts . . . as to which the moving party contends there is no genuine issue." D. Me. Loc. R. 56(b). This local rule requires each statement of material fact to be "followed by a citation to the specific page or paragraph of identified record material supporting the assertion." D. Me. Loc. R. 56(f). A party opposing a motion for summary judgment must then file an opposing statement in which it admits, denies, or qualifies the moving party's statements, with citations to supporting evidence, and in which it may set forth additional facts, again with citations to supporting evidence. See D. Me. Loc. R. 56(c). Ultimately, in constructing the narrative of undisputed facts for purposes of summary judgment, the Court deems any statement with a supporting record citation

admitted but "may disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment." D. Me. Loc. R. 56(f).

## II.     MOTION TO STRIKE (ECF No. 60)

Before constructing the factual narrative in accordance with these procedural rules, the Court must acknowledge that Plaintiff appears in this case pro se. "Pro se parties are not as a rule excused from complying with District of Maine Local Rule 56." Tinkham v. Perry, No. 1:12-cv-00229-GZS, 2015 WL 2092513, *2 (D. Me. 2015). However, "[p]ro se litigants are not held to the same strict standards as attorneys when it comes to technical rules of procedure." Ericson v. Magnusson, No. 2:12-CV-00178-JAW, 2013 WL 2634761, at *2 (D. Me. June 12, 2013).

In this case, Defendant has explicitly moved to strike Plaintiff's "Stipulated Record" (ECF No. 59) and "Statement of Facts" (ECF No. 59-1), which Plaintiff filed on October 31, 2022. The Court concludes that these filings not only violate the procedural rules found in District of Maine Local Rule 56, but that these filings were made in clear violation of this Court's Order Regarding Summary Judgment Briefing (ECF No. 58). As a result, the Court STRIKES these two filings by Plaintiff.[1] Following the resolution of this request to strike, the Court draws its factual narrative from its review of Defendants' Statement of Undisputed Facts (ECF No. 63) ("Def. SMF"), Plaintiff's Response to Defendant's Undisputed Statement of Facts (ECF No. 71) ("Pl. Response SMF"), as well as the exhibits described in the in the List of Record Exhibits (ECF No. 61, PageID #s 768-71).[2]

---

[1] The Court has reviewed and considered the various exhibits that Plaintiff attached to these filings (ECF Nos. 59-3 through 59-15), which Defendants did not move to strike. See Defs. Mot. to Strike (ECF No. 60), PageID # 759.

[2] With respect to any fact that is not admitted in the Statements of Material Fact, the Court has reviewed and cites to underlying exhibits that are included in the summary judgment record (ECF Nos. 61, 63-1 & 63-2).

### III. BACKGROUND

From February 2019 until May 2022, Plaintiff Lorraine Saint Pierre ("Saint Pierre") was a resident of Northfield Green, an apartment complex located at 147 Allen Avenue in Portland, Maine. Northfield Green is a HUD-subsidized housing complex consisting of 201 units reserved for tenants who are disabled and/or at least 62 years of age. (Def. SMF, PageID # 918.) The complex is owned by Defendant NFG Housing Partnership LP ("NFG") and managed by Defendant Preservation Management, Inc. ("PMI").[3] (Id.) Saint Pierre signed an initial lease with NFG on February 9, 2019. (See Def. Ex. 2 (ECF No. 61-1), PageID #s 774-81.) In connection with this lease signing, she also acknowledged receipt of the House Rules & Handbook for Northfield Green and further acknowledged that "failure to follow any of the[ ] House Rules & Handbook information may be considered a violation of the lease and cause for eviction." (Def. Ex. 3 (ECF No. 61-2), PageID # 797.)

#### A. 2019

Shortly after Saint Pierre became a resident of Northfield Green, on March 4, 2019, her next door neighbor lodged a noise complaint related to loud music emanating from Unit 14, which was Saint Pierre's apartment. (Def. SMF (ECF No. 63), PageID # 919; see also Def. Ex. 4 (ECF No. 61-3), PageID # 798-99.)

On November 7, 2019, Saint Pierre submitted a first written request for accommodation to PMI Property Manager Lucia Rivera, asserting that she had a "hearing disability" and requesting that insulation be blown into the interior wall separating her apartment from that of her next door

---

[3] The Court acknowledges that Plaintiff pressed an objection to any factual finding that PMI managed Northfield Green. See Pl. Response SMF, PageID # 986. However, even construing the factual record in the light most favorable to Plaintiff, the Court concludes there is no trialworthy factual dispute as to PMI's role at Northfield Green during the relevant time period.

4

neighbor, who had complained of noise emanating from Saint Pierre's apartment. (Def. SMF (ECF No. 63), PageID # 919 & Def. Ex. 5 (ECF No. 61-4), PageID #s 800-01.) On November 18, 2019, Saint Pierre's audiologist submitted to PMI a completed request for accommodation, which verified that Saint Pierre was hearing impaired, and explained that blowing insulation into the interior wall in question would help reduce the volume of sound emanating from Saint Pierre's apartment. (Def. SMF (ECF No. 63), PageID # 919 & Def. Ex. 6 (ECF No. 61-5), PageID #s 802-04.) On December 4, 2019, PMI's Section 504 Coordinator and Vice President of Administration, Geoffrey Green, sent Saint Pierre a letter indicating that her requested accommodation of additional insulation was "not feasible," but indicated a willingness to "discuss possible alternatives." (Def. Ex. 1-A (ECF No. 63-2), PageID # 930.) On December 18, 2019, Green issued a formal written denial of Saint Pierre's request for accommodation indicating that her request to have blown-in insulation "would require a fundamental alteration in the program or operations at the property." (Def. Ex. 7 (ECF No. 61-6), PageID # 805.)

Saint Pierre responded to Green via email on December 25, 2019. (See Def. Ex. 8 (ECF No. 61-7), PageID # 806.) In that email, she explained that she had sought the accommodation for her neighbor, but had also taken it upon herself to purchase a decibel meter to monitor the volume of noise in her apartment. (Id.) She also attached a note she had sent her neighbor in which she explained how she had requested insulation as an accommodation, but the request had been denied. In the same note, Saint Pierre also explained that she had recently had a hearing aid returned and would be changing her listening habits as a result. (Id., PageID # 807.) During the remainder of her tenancy at Northfield Green, Saint Pierre did not make any further requests for a reasonable accommodation in connection with her hearing impairment. (Def. SMF (ECF No. 63), PageID # 920.)

5

### B.  2020

On January 7, 2020, Saint Pierre was evaluated at the Maine Medical Center Emergency Department for dizziness that was associated with "mold exposure at home." (Def. Ex. 12 (ECF No. 61-11), PageID # 831.)  She was discharged with a specific instruction to have her landlord evaluate her apartment for mold.  (Id. & Def. SMF (ECF No. 63), PageID # 921.)  The next day, Saint Pierre notified PMI that she had a mold allergy and had had a reaction to mold in her apartment.  PMI responded that it would arrange for mold testing in her unit.  (Def. Ex. 11 (ECF No. 61-10), PageID #s 826-27.)  PMI thereafter proposed having a vendor in Saint Pierre's apartment for mold testing on February 3, 2020.  (Id., PageID # 828.)  However, Saint Pierre did not allow access to her apartment for mold inspection or testing any time in 2020.[4]  (Def. Ex. 1 (ECF No. 63-1), PageID # 929.)

On May 28, 2020, NFG, through its counsel, issued Saint Pierre a notice that it intended to terminate her lease at Northfield Green as of June 30, 2020.  (Def. Ex. 9 (ECF No. 61-8), PageID #s 808-11.)  The Notice summarized ten lease violations, two of which related to noise complaints on March 4, 2019, and June 15, 2019.  (Id., PageID #s 808-09.)  The other violations related to Saint Pierre's use of common outdoor space, concerns that both she and her cat were entering and exiting Unit 14 through a window, and her allegedly false statements regarding maintenance and management.  (Id.)  On July 14, 2020, NFG began eviction proceedings against Saint Pierre based on these lease violations.[5]

---

[4] The Court takes judicial notice of the fact that Maine declared a State of Civil Emergency due to the COVID-19 pandemic on March 15, 2020, which continued until June 30, 2021.  See generally https://www.maine.gov/covid19/timeline (last visited 9/29/2023).

[5] Defendant has included the 3/8/21 Decision & Order from state district court docket number PORDC-SA-20-301 as part of the summary judgment record.  See generally Def. Ex. 10 (ECF No. 61-9).  Prior to the entry of this final decision by the state court, this Court had its own occasion to review this forcible entry and detainer complaint as a result of Saint Pierre's attempted removal of that action to this Court.  See NFG Hous. Partners, L.P. v. Saint Pierre,

### C.  2021

After delays associated with the COVID-19 pandemic, two days of evidentiary hearings, and a failed attempt to remove the case to federal court, the state district court issued its final decision in the eviction proceeding on March 8, 2021.  Ultimately, Saint Pierre prevailed in this proceeding and was not evicted.  <u>NFG Hous. Partners, LP v. Saint Pierre</u>, No. SA-20-301, slip op. at 13-14 (Me. Dist. Ct., Portland, March 8, 2021).[6]

**1.  Mold Testing of Unit 14 by PMI**

Thereafter, on April 7, 2021,  PMI Maintenance Superintendent Max Quitog visited Saint Pierre's unit and spoke with Saint Pierre regarding her mold concerns.  (Def. SMF, PageID # 921; Def. Ex. 1 (ECF No. 63-1), PageID # 929.)  He did not see any visual signs of mold in the apartment, but he offered to have a professional test for mold in Saint Pierre's unit.  Saint Pierre declined this offer and asserted that the mold issue was below her unit in the subfloor.  (Def. SMF, PageID # 921; Pl. Response SMF, PageID # 990; Def. Ex. 14 (ECF No. 61-13), PageID # 836.)

On May 7, 2021, Saint Pierre allowed a hygienist from Environmental Safety & Hygiene Associates ("ESHA"), a contractor hired by PMI, to access her apartment for mold testing.  (Def. SMF, PageID # 921; Pl. Response SMF, PageID #s 990-91.)  As a result, ESHA produced an indoor air quality study for Saint Pierre's unit, dated May 11, 2021.  (<u>See</u> Def. Ex. 15 (ECF No. 61-14), PageID #s 837-51 (hereinafter, the "ESHA Report").)  Based on this study, ESHA recommended that decaying plant matter be removed from the unit and that various "old books and periodicals" be removed or "professionally cleaned and sanitized."  (<u>Id.</u>, PageID # 841 & Def. SMF, PageID # 922.)  On June 30, 2021, Dr. Kristen Lang verified that Saint Pierre had a

---

No. 2:20-CV-00421-GZS, 2021 WL 194907, at *1-*2 (D. Me. Jan. 20, 2021).  Thus, the Court takes judicial notice of the procedural history as detailed in this prior decision.

[6] A copy of this slip opinion is included in the record as Def. Ex. 10 (ECF No. 61-9).

"significant allergy to mold," that required mold mitigation from her living space. (Def. Ex. 16 (ECF No. 61-15), PageID # 852 & Def. SMF, PageID # 922.)

### 2. Mold Testing of Unit 14 by Saint Pierre

In the Fall of 2021, Saint Pierre personally hired Northeast Test Consultants ("NTC") to conduct an indoor air quality and mold assessment of her apartment. NTC visited the unit on September 2, 2021, and thereafter produced a report dated November 4, 2021. (Def. Ex. 22 (ECF No. 61-21), PageID #s 868-80 (hereinafter, the "NTC Report").) As noted in the NTC Report, a "musty odor" was observed inside the apartment and in the hallway outside and the apartment bathroom lacked an exhaust fan. (Id., PageID # 870.) Based on sampling, the Report also found that Saint Pierre's apartment had "Moderate-High" mold spore concentrations and was "slightly compromised." (Id., PageID #s 870-71). NTC recommended remedial cleaning to address these issues. (See id., PageID # 871.) After Saint Pierre forward the NTC Report to her landlord, counsel for PMI and NFG responded via letter dated November 19, 2021. (See Def. Ex. 23 (ECF No. 61-22), PageID #s 881-882.) In that letter, counsel suggested that the difference in mold findings between the NTC Report and the earlier ESHA Report was likely the results of intervening water issues that had been the subject of at least one violation notice. (See id., PageID # 881.) Nonetheless, the letter offered to help Saint Pierre with next steps to address the recommendations in the NTC Report. (See id., PageID # 882.)

Following up on the NTC Report, Saint Pierre submitted a second written request for accommodation to PMI on December 20, 2021; specifically requesting that a ceiling fan be installed in her bathroom to "remove some of the mold spores in her apartment." (Def. Ex. 24 (ECF No. 61-23), PageID # 883.) In a letter dated December 27, 2021, Green denied Saint Pierre's second request for accommodation, on the basis that the building was already equipped with a

central ventilation system to which Saint Pierre's bathroom was connected. (Def. Ex. 25 (ECF No. 61-24), PageID # 885.) However, he reiterated PMI's willingness to help with the vacuuming recommended in the NTC Report. (See id.) He also advised Saint Pierre that she had a right to appeal the denial of her requested accommodation. (See id.)

The next day, Saint Pierre did appeal via email and included photographs showing standing water in the grassy area outside her apartment and what appears to be green mold on the exterior siding of the apartment building. (See Def. Ex. 26 (ECF No. 61-25), PageID #s 887-90.) In a letter dated December 30, 2021, PMI denied this appeal indicating that adding a bathroom fan was "not feasible." (Def. Ex. 27 (ECF No. 61-26), PageID #s 892-93.)

### 3. Saint Pierre's Complaint to the Maine Human Rights Commission

On April 11, 2021, Saint Pierre filed a pro se complaint against NFG and PMI with the Maine Human Rights Commission ("MHRC"). (See generally MHRC Compl. (ECF No. 1-1).) In this complaint, Saint Pierre asserted that NFG and PMI had engaged in "a campaign of harassment" against her. (Id., PageID # 13.) She cited the dismantling of her gazebo, the noise complaints, "the mold spores problem," and the first eviction proceeding, which she labeled "retaliatory" because she had complained about "the mold situation" two months prior to the initiation of the eviction proceeding. (Id., PageID #s 13, 15, 21.) In a letter, dated September 22, 2021, MHRC notified Saint Pierre that it had "not found reasonable grounds to believe that unlawful discrimination [had] occurred" and dismissed her complaint. (9/22/21 Ltr. (ECF No. 1-2), PageID # 23.)

### 4. Violations Issued to Saint Pierre

On July 21, 2021, PMI issued Saint Pierre a "First Violation" Notice for failing to report a "water issue" that resulted in flooding of her unit as well as the adjacent hallway and neighboring

9

unit. (Def. Ex. 17 (ECF No. 61-16), PageID #s 853-54.) That same day, PMI issued Saint Pierre a "Second Violation" Notice for failing to answer her door and assist maintenance in accessing her unit to address the water issues. (Id., PageID #s 855-56.)

On October 25, 2021, PMI issued another Notice of Lease Violation to Saint Pierre. This Notice was designated a "Third Violation" and cited Saint Pierre for "continuously leav[ing] the apartment door open[ ] for extended period of time." (Def. Ex. 18 (ECF No. 61-17), PageID # 860.) The next day, on October 26, 2021, PMI issued another Notice of Lease Violation to Saint Pierre. This "Fourth Violation" Notice cited Saint Pierre for "overflowing the kitchen sink" and causing water damage to her unit and a next door unit as well as carpet in the hallway. (Def. Ex. 19 (ECF No. 61-18), PageID # 862.)

On October 27, 2021, PMI issued another Notice of Lease Violation to Saint Pierre. This Notice was designated a "Fifth Violation" and cited Saint Pierre for denying access to her unit for a scheduled annual inspection despite having received advanced notice. (Def. Ex. 20 (ECF No. 61-19), PageID # 864.)

On October 29, 2021, PMI and NFG issued a Notice to Quit to Saint Pierre informing her that her lease would be terminated on December 10, 2021. This Notice cited the violations previously issued to Saint Pierre in 2021, as well as Saint Pierre's interactions with staff, as the basis for terminating her lease. (Def. Ex. 21 (ECF No. 61-20), PageID # 866.)

**5. The Second Eviction Proceeding**

On December 27, 2021, NFG filed a second forcible entry and detainer complaint against Saint Pierre based on the October 29th Notice to Quit. An evidentiary hearing was held on January 6, 2022, at which Saint Pierre appeared pro se and NFG appeared via counsel. On March 22, 2022, the state district court issued findings of fact and entered judgment in favor of NFG based on

concluding that Saint Pierre had "several minor violations" of her lease, which amounted to "material non-compliance with the lease." NFG Hous. Partners, LP v. Saint Pierre, No. SA-21-545, slip op. at 10 (Me. Dist. Ct., Portland, March 22, 2022).[7]  On April 26, 2022, the Maine Superior Court affirmed this judgment in favor of NFG.  See NFG Hous. Partnership LP v. Saint Pierre, No. AP-22-09, 2022 WL 4007564, at *3 (Me. Super. Apr. 26, 2022).[8]  The Law Court then entered an order denying Saint Pierre's motion to stay the writ of possession and dismissing her appeal on May 12, 2022.  See NFG Hous. P'ship LP v. Saint Pierre, No. Cum, 22-131, slip. op. at 2-3 (Me. May 12, 2022).[9]

## IV.   DISCUSSION

This Court had previously construed Plaintiff's pro se Complaint to state plausible claims of "disability discrimination and retaliation pursuant to the federal Fair Housing Act and Maine's fair housing laws." (11/22/21 Rec. Dec. (ECF No. 12), PageID # 121, aff'd 12/20/21 Order Aff'g Rec. Dec. (ECF No. 15), PageID # 132.)  Defendant now seeks summary judgment as to all of those claims.  The Court focuses its discussion on Plaintiff's federal claims recognizing that Plaintiff's claims under the Maine Human Rights Act, specifically, 5 M.R.S.A. §§ 4582-A & 4633, are generally subject to the same standards and interpretations as their federal analogues.  See, e.g., Daniel v. Avesta Hous. Mgmt. Corp., No. 2:12-CV-110-GZS, 2013 WL 4541152, at *6 (D. Me. Aug. 27, 2013).  ("Maine state courts look to federal case law for guidance in interpreting the Maine Human Rights Act.")

---

[7] A copy of this slip opinion is included in the record as Def. Ex. 28 (ECF No. 61-27).

[8] A copy of the slip opinion is included in the record as Def. Ex. 29 (ECF No. 61-28).

[9] A copy of this slip opinion is included in the record as Def. Ex. 30 (ECF No. 61-29).

**A. Disability Discrimination – Refusal to Provide Reasonable Accommodations**

The Court first considers whether the summary judgment record, viewed in the light most favorable to Plaintiff, reflects a trialworthy claim for disability discrimination.[10]

The Fair Housing Act, 42 U.S.C. §§ 3601-3631, as amended by the Fair Housing Amendments Act (FHAA), bars discriminatory housing practices based on an individual's disability. 42 U.S.C. § 3604(f). More specifically, as it relates to this case, the FHAA prohibits disability discrimination in connection with the "rental of a dwelling, or in the provision of services or facilities in connection with such dwelling" and further defines discrimination to include "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(2) & (3)(B). "To prevail on such a reasonable accommodation claim, a plaintiff must show a qualifying handicap, the defendant's actual or constructive knowledge of that handicap, a request for a specific accommodation that is both reasonable and necessary to allow the handicapped individual an equal opportunity to use and enjoy the particular housing, and the defendant's refusal to make the requested accommodation." Summers v. City of Fitchburg, 940 F.3d 133, 139 (1st Cir. 2019) (citing Astralis Condo. Ass'n v. Sec'y, U.S. Dep't of Hous. & Urb. Dev., 620 F.3d 62, 67 (1st Cir. 2010)).

Here, Defendants "do not dispute" that Saint Pierre has trialworthy evidence of a qualifying disability as it relates to "her claimed hearing impairment and allergy to mold," nor do they dispute that they were made aware of these disabilities. (Def. Mot. (ECF No. 64), PageID #s 943-44.) Rather, Defendants focus their summary judgment arguments on the accommodations requested by Plaintiff. All told, Defendants identify three requests for accommodations made by Saint

---

[10] Having reviewed the entire factual record, the Court concludes that the only plausible theory of disability discrimination advanced in this case related to Defendant's alleged failure to provide reasonable accommodations.

12

Pierre: (1) the request for blown-in insulation in November 2019, (2) the request for mold evaluation in January 2020, and (3) the request for a ceiling fan in December 2021.

As to the request for mold evaluation, the Court agrees with Defendants that the undisputed record establishes that this request was granted and any delay in completing the evaluation was not the result of any unreasonable action by Defendants.[11]  (See Def. Mot., PageID # 946.)  Thus, Plaintiff cannot establish a trialworthy failure-to-accommodate claim based on mold evaluation. As a result, the Court is left to consider whether either of Saint Pierre's other two accommodation requests, which were denied, present a trialworthy failure-to-accommodate claim.

In considering these two requests, the Court must consider whether Plaintiff can establish that each requested accommodation was "(1) reasonable and (2) necessary to (3) afford [her] an equal opportunity to use and enjoy housing."  Revock v. Cowpet Bay W. Condo. Ass'n, 853 F.3d 96, 110 (3d Cir. 2017) (cleaned up).  Typically, "an accommodation is reasonable when it imposes no fundamental alteration in the nature of the program or undue financial and administrative burdens on the defendant."  Summers v. City of Fitchburg, 940 F.3d 133, 140 (1st Cir. 2019) (cleaned up).  To be necessary, an accommodation must "be essential, not just preferable." Vorchheimer v. Philadelphian Owners Ass'n, 903 F.3d 100, 107 (3d Cir. 2018).  Thus, the terms of the statute "require[ ] courts to consider alternatives" with a focus on "the goal of providing the particular tenant with equal housing opportunity."  Id., at 107-08.

As it relates to the 2019 request for blown-in insulation, the evidence before the Court establishes that Saint Pierre submitted the necessary paperwork to request this accommodation and

---

[11] Cf. Astralis Condo. Ass'n v. Sec'y, U.S. Dep't of Hous. & Urb. Dev., 620 F.3d 62, 69 (1st Cir. 2010) (concluding that delay in approving a requested parking accommodation by a condominium association constituted a refusal to accommodate where the "circumstances permit a reasonable inference that [the association] effectively short-circuited the interactive process").

asserted it was necessary so that she could listen to music and other programming in her apartment. (See Def. Ex. 6, PageID #s 802-804.) While Defendants initially indicated the requested accommodation was "not feasible," they also indicated a willingness to "discuss possible alternatives." (Def. Ex. 1-A, PageID # 930; see also Def. Ex. 1 (ECF No. 63-1), PageID # 927.) Thereafter, Defendants formally denied the requested accommodation asserting it "would require fundamental alteration in the program or operations at the property," but also alerted Saint Pierre to her right to further appeal this determination. (Def. Ex. 7, PageID # 805.) In reply, Saint Pierre effectively indicated that she had resolved the issue and hoped her implemented solution "will alleviate the neighbor's situation." (Def. Ex. 8, PageID # 806.)

Without any evidence of further noise complaints or further appeal by Saint Pierre, the only reasonable inference that can be drawn from this record is that Saint Pierre either abandoned or "short circuited the interactive process" with respect to her request for an accommodation related to her hearing disability. Astralis, 620 F.3d at 69. As a result, the Court concludes that Defendants are entitled to summary judgment on Plaintiff's claim for failure-to accommodate to the extent the claim is based on her November 2019 request for blown-in insulation.

Turning to the December 2021 request for a ceiling fan, the record before the Court would not allow a reasonable factfinder to conclude that a ceiling fan was a necessary accommodation for Saint Pierre. The NTC Report, which was the mold evaluation independently procured by Saint Pierre, did document that Saint Pierre's unit did not have a bathroom exhaust fan installed as of September 2, 2021. (See Def. Ex. 22, PageID #s 870, 878.) However, it did not include installation of such a fan as a recommendation. (See id., PageID # 871.) Likewise, Saint Pierre did not provide any medical documentation suggesting that a ceiling fan was necessary to

accommodate her mold allergy.[12] In responding to Saint Pierre's request for a ceiling fan, PMI explained that installation of a ceiling fan would "interfere with the existing ventilation system." (Def. Ex. 25, PageID # 885.) In the same letter, PMI further indicated that the ceiling opening in the bathroom was "part of the central ventilation system" and expressed a willingness to reinstall a cover on the opening and to assist with the cleaning recommended in the NTC Report. (Id.) In short, the summary judgment record is devoid of any admissible evidence that creates a genuine dispute regarding the necessity and/or feasibility of installing a ceiling fan to accommodate Saint Pierre's mold allergy. Thus, the Court concludes that Defendants are entitled to summary judgment on Plaintiff's claims that Defendants discriminated against her by failing to provide her requested accommodations.

### B. Retaliation

Beyond protecting individuals from housing discrimination based on disability or other protected characteristics, the FHAA also makes it unlawful to "coerce, intimidate, threaten, or interfere with any person . . . on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by [the FHAA]." 42 U.S.C. § 3617. The basic elements of a claim under § 3617 are: "(1) plaintiff engaged in protected activity; (2) defendant subjected plaintiff to an adverse action; and (3) there was a causal connection between the protected conduct and the adverse action." Kris v. Dusseault Fam. Revocable Tr. of 2017, No. 18-CV-566-LM, 2019 WL 4647211, at *5 (D.N.H. Sept. 24, 2019) (explaining that the elements of a retaliation claim under § 3617 track the anti-retaliation provisions in similar statutes). At the summary judgment stage, the question of whether Plaintiff has a trialworthy § 3617 claim is answered using the familiar McDonnell Douglas burden-

---

[12] In fact, Saint Pierre herself described a ceiling fan as "a first step" that she believed would "remove some of the mold spored in my apartment." Def. Ex. 24, PageID # 883.

15

shifting framework. See McDonnell Douglas Corp. v. Green, 411, U.S. 792 (1973); see also, e.g., Newell v. Heritage Senior Living, LLC, 673 F. App'x 227, 231 (3rd Cir. 2016) (applying McDonnell Douglas to a claim under 42 U.S.C. § 3617).

Here, Defendants do not dispute that the record establishes the first two elements, but they argue they are entitled to summary judgment on the causal connection element. With respect to Saint Pierre's protected activity, Defendants assert that the key dates are the dates on which Saint Pierre requested accommodations, i.e., November 7, 2019, January 8, 2020, and December 20, 2021, as well as the date she initiated her complaint with MHRC, i.e., April 11, 2021, and this action, which she filed on October 18, 2021. Accepting these dates as dates on which Saint Pierre exercised her fair housing rights, Defendants maintain that the record before the Court would not allow a fact finder to conclude that there was a causal connection between Saint Pierre's activity on those dates and their two attempts to terminate her lease and evict her, which were initiated on May 28, 2020 and October 28, 2021, respectively. See, e.g., Kris, 2019 WL 4647211, at *6 ("Initiation of eviction proceedings is widely considered an 'adverse action' under the FHA.")

Considering the full timeline of events, the Court readily finds that the record presents a *prima facie* case for causal connection.[13] However, with the burden then shifted to Defendants to identify a legitimate, non-retaliatory reason for their initiation of eviction proceedings, the Court concludes that the summary judgment record also supports a finding Defendants sought to evict Saint Pierre for legitimate lease violations unrelated to her protected activity.[14] Thus, "the burden

---

[13] Perhaps most problematic in this timeline is the second eviction proceeding, which was initiated a mere ten days after Saint Pierre filed this action. The Court notes that this alleged retaliatory action is not pled in the Complaint. Nonetheless, Defendant's Motion for Summary Judgment is premised on the Court considering these post-filing actions and, in light of Plaintiff's *pro se* status, the Court construes these allegations as reasonably related to the retaliation claims stated in her original complaint. See Def. Mot., PageID # 947-48.

[14] In reaching this conclusion, the Court notes that these lease violations were established after evidentiary hearings in the state court. See generally Def. Exs. 10 & 28. Thus, those findings cannot be deemed genuinely disputed here. See Pacheco v. Libby O'Brien Kingsley & Champion, LLC, 288 A.3d 398, 400 (Me. 2022) ("[I]ssue preclusion, also

then returns to the plaintiff to show that the defendant's explanation is a pretext for unlawful retaliation." Lopez-Hernandez v. Terumo Puerto Rico LLC, 64 F.4th 22, 32 (1st Cir. 2023) (cleaned up).

At this pretext stage, temporal proximity alone is often insufficient to defeat summary judgment. See id. at 32 (finding "temporal proximity of almost five months" insufficient on a Title VII retaliation claim); see also Lloyd v. Presby's Inspired Life, 251 F. Supp. 3d 891, 905-06 (E.D. Pa. 2017) (declining to find that there was a causal link to support plaintiff's § 3617 claim). Ultimately, "in order to fend off a grant of summary judgment . . . , [a plaintiff must show] more than that the defendants' asserted reason for taking adverse action against [her] was not the real reason. [She] must show that the reason given was a cover for retaliation." Robinson v. Town of Marshfield, 950 F.3d 21, 30 (1st Cir. 2020) (cleaned up). Here, the record would not allow a factfinder to conclude that Defendants treated tenants with similar lease violations differently. Cf. Dusel v. Factory Mut. Ins. Co., 52 F.4th 495, 507 (1st Cir. 2022) (explaining how a plaintiff can "identify a similarly situated comparator" to demonstrate pretext through disparate treatment). Likewise, the record is devoid of admissible evidence that would allow a reasonable factfinder to find that the documented lease violations were implausible or manufactured. See id. at 511. Thus, without a genuine dispute regarding pretext, the Court concludes that Plaintiff does not have a trialworthy claim for retaliatory eviction under § 3617.

---

known as collateral estoppel, which "prevents the relitigation [in a later proceeding] of factual issues already decided [in an earlier proceeding]" and "applies even when the two proceedings offer different types of remedies.") (quoting Portland Water Dist. v. Town of Standish, 940 A.2d 1097 (Me. 2008).

## V. CONCLUSION

For the foregoing reasons, the Court GRANTS both Defendants' Motion to Strike Plaintiff's "Stipulated Record" and "Statement of Facts" (ECF No. 60) and Defendants' Motion for Summary Judgment (ECF No. 64). In accordance with these rulings, the Court STRIKES Plaintiff's "Stipulated Record" (ECF No. 59) and "Statement of Facts" (ECF No. 59-1) and ORDERS that final judgment enter on behalf of Defendants.

SO ORDERED.

      /s/ George Z. Singal
      United States District Judge

Dated this 29th day of September, 2023.